Filed 8/29/24  P. v. Shojaei CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G062293 |
| v. | (Super. Ct. No. 18HF1163) |
| MOHAMMADREZA SHOJAEI, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Richard M. King, Judge. Affirmed.

Steven S. Lubliner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Maxine Hart, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Mohammadreza Shojaei was convicted of animal cruelty for maliciously injuring his roommate's dog, Max. At trial, defendant testified he loved Max and injured him only by accident. However, an animal services officer testified the circumstances surrounding the incident were inconsistent with defendant's version of events. Defendant contends the officer was not qualified to render an opinion on that issue, but we find no abuse of discretion in the trial court's decision to the contrary. Accordingly, we affirm the judgment.

## STATEMENT OF FACTS

Max was a 16-pound Chihuahua/Shih Tzu mix. His owner shared an apartment with defendant and usually tended to his needs. However, on May 26, 2018, she was out of town, and defendant was responsible for looking after Max.

That day, at around 3:00 p.m., defendant called 911 in a panic and reported Max was paralyzed and dying on the floor. Asked what happened, defendant said, "He bite me. I shake my hand. He hit the wall." Defendant requested assistance, so the police were dispatched to his Irvine apartment.

One of the officers who arrived there was Animal Services Officer Madison Morris. She found Max lying on his side in the hallway next to the kitchen. Although Max was conscious, he could not lift his head or move his body, and he had defecated on himself. Defendant, who was anxious and emotional, told Morris that Max bit his hand in the bathroom. He said that in reaction to the bite, he pulled his hand back and shook his arm to get Max off him, and that is when Max hit the wall.

Defendant also said he bled from the bite, but when Morris looked in the bathroom, she did not see any blood. In fact, when defendant

2

showed her his hand, she did not see any sign of injury until defendant directed her to the precise spot where Max had bitten him. In the area around his right thumb, defendant had some superficial "tooth scrapes" and "puncture/skin breaks." But, according to Morris, the wounds were minor and nonpenetrating; they did not require irrigation, antibiotics, or stitches. Yet, when the police photographed the wounds, defendant was very fidgety and had to have his hand held still.

Morris took Max to a veterinary hospital, where he was diagnosed with a fractured neck and a compressed spinal cord. His treating doctor believed the injuries were caused by head-on blunt force trauma. He surmised there was a chance that Max could walk again if he had major surgery, but his owner decided to put him down. A necropsy confirmed Max had suffered serious neck trauma. The performing pathologist opined his injuries resulted from the type of severe and sudden impact that commonly occurs in car accidents.

At trial, defendant testified he grew up in Iran and had a hard time expressing himself in English sometimes. On the day in question, he wanted to take Max for a walk, but when he got his leash, Max went under the kitchen table. Defendant tried to coax him out by showing him the remote control associated with his collar. However, Max nipped at the remote and ran into the bathroom. Defendant followed, finding Max behind the door. When he bent down to pet him, Max bit his thumb and took most of the appendage in his mouth. Seeing blood in Max's mouth, defendant became very frightened because he is hemophobic. He started shaking his arm side to side in order to free his thumb, and as he was doing so, Max hit the wall and slumped to the floor. Asked if Max left the ground before impact, defendant said no.

3

After washing his hands in the kitchen and attending to his wounds, defendant returned to the bathroom and discovered Max was still not moving. He used a mat to transport Max into the hallway area. Then he pricked his paw with a pin to see if he could feel any pain. When Max did not respond, he called 911 and requested emergency assistance. According to defendant, the entire ordeal was an accident; he loved Max very much and never intended to hurt him.

Morris had a different take on the situation, based on what she saw at the scene. At trial, she testified that during her time as an animal services officer for the Irvine Police Department, she responded to approximately 200 calls involving dog bites.[1] Some of those calls were for serious, penetrating bites. However, Morris described defendant's injuries as minor scraping wounds. She did not believe they were consistent with defendant's claim about how Max was injured.

In rendering that opinion, Morris took issue with defendant's testimony that Max never left the ground before hitting the wall. Based on the severity of Max's injuries, Morris was convinced that he must have been lifted off the ground prior to impact. However, she said that could not have occurred while defendant was shaking his arm because Max did not bite him deep enough to allow the dog to latch onto his thumb in the first place. Therefore, defendant's story about how Max was injured did not add up to her.

To counter Morris' testimony, the defense called Dr. Kimberly Carvalho-Faucher, a specialist in veterinary forensics. She testified it is

_____

[1] Morris worked as an animal services officer for two-and-a-half years before becoming a regular patrol officer. She is currently a deputy with the Orange County Sheriff's Department.

impossible to quantify the amount of force required to break a small dog's neck because there are too many variables involved. However, if the dog's neck were compressed at a certain angle where the spinal process is at its highest point, it would take less force than usually required to cause significant injury. Dr. Carvalho-Faucher also testified there was nothing in Max's necropsy's report indicating that he had brain damage, which is commonly seen in severe trauma cases.

In the end, the jury convicted defendant of malicious animal cruelty under Penal Code section 597, subdivision (a). After reducing the conviction from a felony to a misdemeanor pursuant to Penal Code section 17, subdivision (b), the trial court sentenced defendant to one year of formal probation on the condition that he serve 90 days in jail. This appeal followed.

## DISCUSSION

Defendant argues the trial court erred in allowing Morris to testify about the plausibility of his testimony as to how Max was injured because that issue was outside the scope of her expertise. In so arguing, defendant claims Morris testified that Max was injured by him "picking Max up off the ground and slamming him into a wall."

Our response is threefold. First, Morris did not actually say that in her testimony. Second, Morris was qualified to offer an opinion on the plausibility of defendant's version of events. And third, even if she was not, the error in allowing her to do so was both invited and harmless.

## I.

### FACTUAL BACKGROUND

We begin with an overview of how Morris' testimony unfolded. On direct examination, she testified that she responded to over 400 calls of animal abuse during her career as an animal services officer. Roughly half of

5

those calls involved dog bites, ranging from serious "mauling" bites, which result from the dog sinking his teeth into the victim's skin, to minor "tooth scrapes," which are caused when the victim's hand briefly comes in contact with the dog's teeth. Most of the injuries she observed on defendant were of the latter variety; "very superficial or light cut[s] caused by a tooth." Defendant also had a couple of "single point," "puncture/skin break" wounds, but they were not penetrating or serious.

Given Morris' experience handling dog bite cases, the prosecutor wanted to ask her if defendant's injuries were consistent with his testimony about how Max was injured. Recall, defendant had testified that after Max bit his thumb, he shook his arm back and forth to get Max off him, implying that Max had latched onto his thumb with his teeth. And during the shaking, Max hit the wall without ever having left the ground. The prosecutor wanted to ask Morris if defendant's injuries were such that Max could have actually latched onto his thumb in the first place.

Defense counsel objected on the basis Morris was not qualified to render an opinion on that topic. However, during voir dire, Morris testified that she had personally observed injuries that resulted from dogs latching onto a victim's hand with his teeth. Therefore, even though Morris admitted she had no formal medical training on latching injuries and had not read any research papers about them, the trial court allowed the prosecutor to go forward with his questioning. Back in front of the jury, the following exchange occurred between him and Morris:

"Q. Was the bite mark that you observed on the defendant consistent with how he told you he received that bite mark?

"A. No.

6

"Q. Based solely on what you observed . . ., what about that bite mark is inconsistent?

"A. The depth.

"Q. And what do you mean by 'depth'?

"A. That [the bite] is not a sufficient depth to lift a dog [of Max's] size."

On cross-examination, Morris conceded she had no personal knowledge as to whether Max was actually lifted off the ground, and the pattern of the scrape marks on defendant's hand was generally consistent with his claim about shaking his arm. But when defense counsel asked if that meant defendant's injuries were consistent with his claim about how Max was injured, Morris answered no. Instead of leaving that answer alone, defense counsel proceeded to ask Morris *why* she felt that way. Morris said that if defendant shook his arm to extract Max from his thumb while Max was on the ground, it would not have created enough force to break his neck when he hit the wall. Therefore, the only way for Max to have sustained such a serious injury was if he had been "lifted airborne off the ground."

When defense counsel objected to that answer on foundational grounds, the trial judge met with the attorneys outside the presence of the jury to discuss the issue. Defense counsel argued Morris did not have sufficient knowledge of the type of force required to break a dog's neck to opine on how Max was injured. However, the judge overruled the objection and allowed Morris's answer to stand. In so doing, the judge told defense counsel that she only had herself to blame for the answer because she asked Morris an open-ended question. Nevertheless, the judge said he would allow her free rein to question Morris about the foundation for her opinions.

7

When cross-examination resumed, defense counsel asked Morris about her training and experience on the amount of force required to break a dog's neck. While admitting she had no formal training on that issue, Morris said she had investigated and reviewed cases where dogs had suffered broken necks from car accidents, being stepped on, and running into sliding glass doors. In such cases, it was her responsibility to determine whether the dog's injuries were caused by accident or abuse. To make that determination, she would talk to witnesses, watch any available surveillance footage, and review the veterinarian records to get an understanding of how the injury incurred.

Morris conceded, though, she did not know: 1) the amount of force or momentum needed to break a dog's neck; 2) the amount of force, momentum or speed defendant generated by shaking his arm after Max bit him; 3) how far defendant's arm was extended from his body at that time; 4) how long Max was latched on to defendant's thumb; 5) how Max hit the wall; or 6) what his neck flexion was at impact. Morris also admitted that, although defendant demonstrated to her how he shook his arm following the bite, he did not reenact the biting incident for her in terms of where he was standing when Max hit the wall or the angle at which the impact occurred.

## II.

### ANALYSIS

Defendant does not challenge Morris' qualifications to testify as an expert on dog bites. However, he contends she had no business testifying about how Max's injuries occurred. More particularly, defendant complains that Morris was improperly allowed to testify that he "must have picked up Max and thrown him into a wall." But Morris never testified that defendant picked up Max or that he threw Max against the wall. Rather, she simply

8

opined that Max's injuries were inconsistent with defendant's claim that Max never left the ground prior to hitting the wall.

Moreover, defense counsel was the one who elicited Morris' testimony on that topic. As explained in *People v. Bell* (2020) 47 Cal.App.5th 153, the invited error doctrine precludes a defendant from mounting an appellate challenge to testimony that was elicited from his own attorney. (*Id.* at p. 193; accord, *People v. Williams* (2009) 170 Cal.App.4th 587, 620.) Defendant contends *Bell* was wrongly decided, but our Supreme Court has ruled similarly in many cases. (See, e.g., *People v. Harrison* (2005) 35 Cal.4th 208, 237; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1138–1139; *People v. Visciotti* (1992) 2 Cal.4th 1, 72; *People v. Simmons* (1946) 28 Cal.2d 699, 722.) We are not at liberty to depart from those decisions. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455.)

Even if the issue were properly before us, we do not believe the trial court erred in allowing Morris to testify about the plausibility of defendant's version of events. A witness is sufficiently qualified to testify as an expert if she has sufficient skill or expertise in the field such that her testimony would likely assist the jury in its search for the truth. (Evid. Code, § 801, subd. (a); *People v. Mayfield* (1997) 14 Cal.4th 668, 766, abrogated on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2.) "The qualification of expert witnesses, including foundational requirements, rests in the sound discretion of the trial court." (*People v. Ramos* (1997) 15 Cal.4th 1133, 1175.) An abuse of discretion will only be found if the evidence shows the witness clearly lacked qualification as an expert. (*People v. Farnam* (2002) 28 Cal.4th 107, 162.)

Defendant argues Morris' testimony about Max's injuries was outside the scope of her expertise. (See generally *People v. Pearson* (2013) 56

9

Cal.4th 393, 445–446 [an expert's qualifications must relate to the particular subject on which she testifies]; *People v. Hogan* (1982) 31 Cal.3d 815, 852 [same], disapproved on other grounds in *People v. Cooper* (1991) 53 Cal.3d 771, 836.) In that regard, defendant claims Morris lacked the formal education and training required to opine about the degree of force needed to break a dog's neck and whether Max's injuries could have resulted from how he described the incident.

However, a witness's expertise "is not subject to rigid classification according to formal education or certification." (*People v. Ojeda* (1990) 225 Cal.App.3d 404, 408.) Rather, expertise may be established by showing the witness "'has the requisite knowledge of, or was familiar with, or was involved in, a sufficient number of transactions involving the subject matter of the opinion.'" (*ABM Industries Overtime Cases* (2017) 19 Cal.App.5th 277, 294.) In other words, personal experience with the subject matter of the expert opinion will suffice.

Morris testified that during her time as an animal services officer, she responded to and reviewed cases in which dogs had suffered broken necks in a variety of situations. Her job was to examine the circumstances involved to determine whether the injury was an accident, or it resulted from abuse or neglect. That assessment required Morris to examine the nature of the dog's injuries in light of any other available evidence, such as witness statements about how the incident occurred, which is precisely what she did in this case. As such, she was qualified to testify about the significance of Max's injuries, and the trial court did not abuse its discretion in allowing her testimony on that subject to stand.

Furthermore, any error in allowing Morris to testify about Max's injuries was mitigated because defense counsel cross-examined her rigorously

about the foundation for her opinions, and the jury was instructed to consider that foundation in assessing the value of her testimony. (CALCRIM No. 332.) The jury was also instructed that it could disregard Morris' opinions altogether if they were unbelievable, unreasonable, unsupported by the evidence, or refuted by another, more qualified, expert. (*Ibid*.) Thus, it is unlikely the jury blindly accepted Morris' testimony without critically examining the basis for her opinions.

In considering the issue of prejudice, it also important to keep in mind that the doctor who treated Max at the emergency hospital and the doctor who performed his necropsy both opined that Max's injuries were likely caused by high-impact blunt force trauma. So, even without Morris' testimony, defendant would have had a hard time convincing the jury he injured Max by accident.

For all these reasons, it is not reasonably probable defendant would have obtained a more favorable result at trial absent Morris's testimony regarding the cause of Max's injuries. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Therefore, there is no basis to disturb the jury's verdict.

DISPOSITION

The judgment is affirmed.

DELANEY, J.

WE CONCUR:


O'LEARY, P. J.


SANCHEZ, J.

11