Filed 9/30/24; Certified for Publication 10/24/24 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| TERRENCE RICHARD, | B322044 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. BC665842) |
| UNION PACIFIC RAILROAD COMPANY, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gregory W. Alarcon, Judge.  Reversed.

Hildebrand, Mcleod & Nelson, Victor A. Russo, and Charles S. Bracewell, for Plaintiff and Appellant.

Pacific Employment Law, Joseph P. Mascovich; Quinn • Covarrubias, Stephanie L. Quinn, and Mariel Covarrubias, for Defendant and Respondent.

_____

## INTRODUCTION

Terrence Richard fell from a train and broke his leg while working as a brakeman for Union Pacific Railroad Company (Union Pacific). Richard sued Union Pacific for negligence under the Federal Employers' Liability Act (FELA) (45 U.S.C. § 51 et seq.). A jury returned a special verdict for Union Pacific, finding the company was not negligent.

On appeal, Richard contends the trial court erred by granting Union Pacific's motion in limine to exclude the testimony of Richard's retained expert, Richard Hess. Hess is a retired Union Pacific railroad engineer who had worked for the last 15 years of his career on the track where Richard was injured. Hess would have testified that when starting a very long train on that track, it is necessary to engage the throttle and release the brakes simultaneously to avoid excessive "slack action" at the rear of the train. "Slack action" is the movement of the expandable and retractable coupling spaces between a train's railcars. The length of the train increases the slack, and the amount of slack action affects the severity of the shock of train movements. Hess further would have testified that immediately before Richard's accident, the locomotive engineer released the brakes and then waited 24 seconds before engaging the throttle. Hess would have opined that this delay caused a surge at the end of the train where Richard was working, making it difficult for him to avoid losing his footing.

We conclude that the trial court erred by excluding Hess's testimony. Hess had experience relevant to the subject about which he was to testify, and his testimony would have been helpful to the jury because it would have assisted the jury in

2

interpreting the video of Richard's fall and understanding how the locomotive engineer's actions may have caused a surge at the rear of the train. The exclusion was prejudicial because it left Richard without a witness to testify to what Union Pacific's locomotive engineer did and why it was dangerous. We therefore reverse the judgment for Union Pacific and remand the matter for a new trial.

## FACTS AND PROCEDURAL BACKGROUND

### I. Richard's injury.

On the evening of February 21, 2016, Richard was working as a brakeman at Union Pacific's City of Industry railyard. Shortly after 6:00 p.m., Richard, conductor Raymond Salcido, and locomotive engineer David Pereyra were assigned to route an incoming train from track 801 to the railyard. When the train arrived, Richard disconnected the rear locomotive from the back of the train. He then climbed aboard the rear railcar and directed the locomotive engineer, Pereyra, to pull forward about 25 car lengths. As the train moved forward, Richard fell from the rear railcar, sustaining a compound fracture to his ankle. Richard's injury required three surgeries and created ongoing physical limitations.

The train from which Richard fell was more than 7,000 feet long and was composed of front and rear locomotive engines and 105 intermodal railcars—flatbed railcars with double-stacked cargo containers on top.[1] The railcars were connected by

---

[1] For consistency, we will refer throughout this opinion to the engines powering the trains as "locomotives," to the intermodal cars as "railcars," and to the locomotives and railcars together as the "train."

3

"knuckles" that created slack between the railcars, allowing the train to go around curves and over hills and valleys.  Because of its length, the train had a total of about 55 feet of slack between the railcars.

The train was powered by diesel locomotives, which generated electricity that was sent through a grid to the axles that turned the train's wheels.  The locomotive engineer controlled the train's speed by engaging the throttle.  At higher throttle settings, the locomotive generated more electricity, sending more "tractive effort" to the axles to turn the wheels.[2] The locomotive engineer also controlled the train's two braking systems:  (1) the "locomotive brakes" (also called the "independent" brakes) that decelerated/stopped the locomotive; (2) and the "train brakes" (also called the "automatic brakes") that decelerated/stopped the railcars.  The train brakes were powered by air, which traveled through a brake pipe to each railcar.  Because of the length of this train, it took about 20 seconds for the train brakes to fully engage.

The track on which Richard fell had an unusual "bowl" or "U" shape, such that when a long train was stopped on it, the train's rear cars were on a downhill slope and its front cars were on an uphill slope.  Because of the track's grade, the rear railcars

---

[2]        "Tractive" means "used for pulling or drawing." (CollinsDictionary.com, <https://www.collinsdictionary.com/us/dictionary/english/tractive> [as of Sept. 9, 2024], archived at https://perma.cc/75GJ-STF9>.) "Tractive effort" is "the force exerted by a locomotive or other powered vehicle on its driving wheels."  (CollinsDictionary.com, <(https://www.collinsdictionary.com/us/dictionary/english/tractive-effort> [as of Sept. 9, 2024], archived at <https://perma.cc/SW59-PWWM>.)

of a stopped train could "bunch" together, contracting the coupling space between the railcars. In that event, the back of the train could not begin moving until the slack between the rear railcars had been eliminated or "pull[ed]" out.

Data retrieved after the accident from the train's event recorder or "black box" showed that Pereyra began releasing the train brakes at 18:40:59. Twenty-four seconds later, at 18:41:23, Pereyra moved the throttle from "idle" to "throttle one." The train brakes were fully released by 18:41:32. Pereyra then released the locomotive brake, and at 18:41:51, he moved from throttle one to throttle two. The wheels began to move at 18:42:05, and Pereyra moved the throttle back to throttle one at 18:42:16. The fastest speed reached by the locomotive before Pereyra applied the brakes was 3.6 or 3.7 miles per hour.

A surveillance video of the train yard on the night of the accident (the yard surveillance video) showed Richard falling from the rear railcar after the train began moving.

## II.    The present action.

### A.    Complaint.

Richard filed the present action in June 2017, alleging a single cause of action for negligence under FELA.[3] Richard

---

[3]    Although injured employees in California generally are entitled to workers' compensation benefits regardless of whether the employer was at fault (Lab. Code, § 3200 et seq.), workers' compensation benefits are not available to railroad employees who suffer on-the-job injuries. Instead, their right of recovery is governed by FELA, which permits recovery only if the employer was negligent. (*Fair v. BNSF Railway Co.* (2015) 238 Cal.App.4th 269, 275 (*Fair*); *Lund v. San Joaquin Valley Railroad* (2003) 31 Cal.4th 1, 6 (*Lund*).) An action under FELA may be brought in either federal or state court. If a FELA action is brought in

5

claimed the locomotive engineer's negligent train handling made the train suddenly surge forward, causing Richard to lose his grip and fall off the railcar's platform.[4]  Union Pacific maintained there was no surge, and Richard fell because he was improperly positioned when he directed the locomotive engineer to begin moving the train.  Specifically, Union Pacific contended that Richard was walking across the railcar's rear platform when the train began moving, which caused him to lose his balance and fall.

## B.     Union Pacific's motion in limine to exclude the testimony of retained expert Richard Hess.

In January 2022, Richard advised Union Pacific that he intended to call Richard Hess as a retained expert at trial to testify on " 'all aspects of liability,' " including " 'safe railroad and locomotive engineer operating practices' " and " 'defendant['s] liability in this case.' "  Hess was a retired Union Pacific locomotive engineer who had 42 years of experience operating freight trains, including on the track where the accident occurred.  Hess did not prepare an expert report, but he disclosed in writing the morning of his deposition that he intended to testify that the delay between the time the engineer released the train brakes and engaged the throttle created excessive "slack action" and

---

state court, "state law governs procedural questions, while federal law governs substantive issues."  (*Fair*, at p. 275; *Lund*, at pp. 6–7.)

[4]     Richard also claimed that his injuries were exacerbated by unsafe conditions on the track where he fell.  This claim is not relevant to the issues Richard raises on appeal, and thus we do not discuss it.

caused the rear railcar to "suddenly snap forward." The excessive slack action would have been avoided by engaging the throttle at the same time the train brakes were released, "allowing no slack action [and] creating a smooth start of the rear car."

Union Pacific filed a motion in limine to exclude Hess's testimony on the grounds that his proposed testimony did not meet the standards for admissibility under Evidence Code[5] sections 801 and 802. Union Pacific asserted that Hess had no specialized education or training in the field of accident reconstruction or injury biomechanics, had never qualified as an expert witness, and had no formal training in interpreting locomotive event recorder downloads. Union Pacific thus contended that Hess was not qualified to interpret the locomotive event recorder downloads or to opine that Richard was thrown from the train due to slack action or improper train handling.

Richard opposed the motion in limine. He contended that formal education was not a prerequisite for expert qualification; " 'mere' experience in a trade, occupation, or craft will qualify an expert in his or her field." Hess had extensive experience as a locomotive engineer, which gave him "special knowledge and skill . . . about operating the same type of freight train at the exact same location where this accident occurred." Moreover, Hess's opinions were based on his review of the yard surveillance video taken the night of the accident, which showed the railcar on which Richard was standing "jerk forward suddenly before . . . Richard fell," and on Union Pacific's expert's testimony about what the event recorder data showed. Richard asserted that

_____

[5] All subsequent statutory references are to the Evidence Code unless otherwise indicated.

Hess "is well qualified to opine that, assuming [Union Pacific's expert] is correct about what the data shows, it demonstrates negligent train handling."

The trial court tentatively granted Union Pacific's in limine motion, subject to a hearing under section 402.

## C. Section 402 hearing.

The court conducted a section 402 hearing immediately prior to opening statements. Hess testified that he worked as a fireman and locomotive engineer for Southern Pacific and Union Pacific Railroad for 42 years. He retired in 2013. Hess had no formal training in accident reconstruction, but he trained student engineers periodically for about 10 years.

Hess worked for the last 15 years of his career on the track where Richard's accident took place. When a train is in this location, the front part of the train is going uphill and the rear part is going downhill.

Hess reviewed the locomotive's event recorder data and the deposition testimony of Union Pacific's expert, Mark Pollan. Although Hess could not interpret all of the event recorder data, he was able to "look at the chart . . . Pollan testified about and follow what [Pollan's] talking about." Hess noted that Pollan had testified that the locomotive engineer, Pereyra, released the train brakes at 18:40:59, and then waited 24 seconds before engaging the locomotive's throttle. Hess opined that this 24 second delay was unsafe because it allowed the brakes on the railcars to "almost fully release[]" before the engineer began applying power to the locomotive. Hess explained that by "waiting, you are letting all of the brakes release on the train totally, which like I said, being a part of the train is in a bowl like that, the front of the train is going uphill, the middle is around that big Y . . . .

8

Nothing is holding it from moving."  In other words, the result of releasing the train brakes was that the downward-facing railcars at the rear of the train would slide forward into the "bowl" in the center of the track.  When the engineer then engaged the throttle and the train started moving, the rear railcar that had been bunched up against the car in front of it surged forward, going from "sitting still to four miles an hour."  The surge would "cause a jolt" to a person on the rear railcar "and make it hard for him to hold on."

Hess stated that the proper way to move the train on this track was to engage the throttle and release the train brakes simultaneously.  He explained:  "[T]he way I made that move, I immediately went into power and started releasing so the brakes release."  By releasing the brakes and engaging the throttle simultaneously, Hess said, the railcars were pulled "gently" and "the whole train would move more as one [solid] unit."

Hess opined that the jolt caused by the engineer's delay in engaging the throttle was apparent from the yard surveillance video.  He testified:  "[T]he [rear railcar] slowly start[s] to move and then it speeds up.  And that's when you see [Richard] fall right there because you see that it was going a slower speed and then it sped up, and you could see him falling."  If the train had been operated properly, Hess explained, it "[would]n't surge like that."

At the conclusion of the section 402 hearing, the trial court excluded Hess's testimony, finding Hess "has no training or experience.  He doesn't have any qualifications that the expert witnesses that are going to testify in this case have."

9

### III.   Trial.

The jury heard evidence over five days in March 2022, as follows.

#### A.   Plaintiff's evidence.

Richard testified that on the evening of the accident, he detached the rear locomotive from the train and then climbed onto the train's rear railcar.  He adopted a three-point stance by bracing both feet and holding a grab iron with his left hand while holding a lantern in his right hand.  He then directed the locomotive engineer to move forward.  There was a "sudden surge" as the railcar on which Richard was standing began moving "real fast" and he lost his grip.  He attempted to grab onto the grab iron near him but was not able to do so.  He then turned toward the back of the railcar and "almost jumped off . . . trying to land" so he would not fall backwards.

Richard testified he had previously experienced a surge or "slack action," but this one was far "more violent."  He had "never experienced any surge like that before in [his] career."

Raymond Salcido, the train's conductor the evening of the accident, testified that when a locomotive pulls a train forward, it lengthens the train by "drawing slack out between the cars which is stretching them, building up the momentum so you can get the entire train into motion."  A mild to moderate surge caused by the "slack action" is expected as a train begins moving.  It therefore is important to adopt a three-point stance by holding on/bracing with two feet and one hand, or with two hands and one foot.  It is permissible to ride on a railcar platform if a three-point stance can be maintained.

10

Immediately before the accident, Salcido heard a loud, metallic sound from the train Richard was working on.[6] He then heard Richard say on the radio, "Man down. My leg is broken." He immediately went to where Richard had fallen and saw that Richard's right foot was pinned under the rail.

Pereyra, the locomotive engineer the evening of the accident, testified that Richard radioed him to pull forward about 25 railcar lengths. Pereyra applied the throttle and released the "independent" brake—i.e., the brake controlling the locomotive. He moved forward some distance and then heard someone say, "I'm hurt." He turned up the volume on his radio and heard Richard screaming that his leg was broken. Pereyra immediately applied the brakes and stopped the train.

Pereyra testified that if a locomotive engineer has not properly set the train brakes, "you'll get [a] boom, boom, boom" noise and the train can surge. Immediately before the accident, Pereyra did not "feel any reverberation or . . . any slack." He is "absolutely certain that [he] did nothing that would have hurt anybody."

## B.    Union Pacific's evidence.

---

[6]    The trial court excluded Salcido's testimony that if an engineer starts a train properly there is not much sound as the slack between the railcars is drawn out, but "[i]f it isn't handled properly and the slack action comes out you can hear a lot of crashing noises." The court also excluded Salcido's testimony that if a train is properly handled, the slack action is mild, but with a "bad engineer . . . it could get pretty rough." The court further excluded Salcido's testimony that it would "sometimes but not always" be possible to maintain one's grip if slack action is severe, and severe slack action can be "enough to make you lose your grip no matter how careful you are being."

### 1. James Cramer.

Union Pacific's transportation manager, James Cramer, testified that he investigated the accident for Union Pacific. He reviewed the data generated by the locomotive's event recorder, which showed the speed the locomotive traveled, whether it was in forward, reverse, or neutral, and if the brakes were employed.

Cramer explained that if the locomotive engineer applied the brakes and pulled the throttle too hard, "that could create an issue. [¶] . . . [¶] So . . . what you are looking for is to make sure there is no abrupt actions by the locomotive engineer." Cramer concluded that the event recorder data showed "a very textbook start. The engineer was very careful, very slow and meticulous as he started to make his forward move." He said: "[W]hat I saw on the event recorder . . . was that the engineer released the train brakes. As the train brakes released there is air that goes through the brake pipe and it [gets] to each car and the brakes start to release. [The locomotive engineer] went to Throttle 1, the first throttle position. There [are] a total of eight. And as he did that, there was no movement for several seconds because the locomotive has to generate tractive effort on the traction motors on each wheel on . . . each ax[le]. So as you see, the tractive effort come up, there is still no movement. And then it slowly starts to move forward as he goes to Throttle 2. And as he [is] getting forward movement, very slightly, he goes back to Throttle 1. Again, I would say he is being very careful. And as movement started to move forward – I believe he was maintaining Throttle 1, between Throttle 1 and Throttle 2. And the movement after that was very steady. Meaning, there was no big spikes in speed up or down. It was very steady state across the

movement I saw." Cramer concluded: "It was a textbook start. I don't think he could start any slower."

Cramer agreed with Richard's counsel that if the engineer mishandles the train, the rear railcar can surge forward with so much force that a person can be thrown from the car. He also agreed that the event recorder data showed the acceleration of the locomotive, not the railcars.

### 2. Mark Pollan.

Railroad consultant Mark Pollan testified about the data generated by the train's event recorder immediately prior to the accident. In brief, he said that the event recorder showed that the locomotive engineer began releasing the train brakes at 18:40:59, moved the throttle from "idle" to "throttle one" at 18:41:23, had fully released the train brakes by 18:41:32, and moved from throttle one to throttle two at 18:41:51. By 18:42:05, the wheels had begun to move, and at 18:42:16, the locomotive engineer moved the throttle back to throttle one. On the basis of this data, Pollan concluded: "There is no train handling issue. There is no excessive force. There is no excessive throttle. He was actually extremely careful."

Pollan also testified that the yard surveillance video was not consistent with Richard's account of where he was standing when he fell. Pollan said a frame-by-frame analysis of the video showed that when the train began moving, Richard was not on the side of the car holding on to the handles as he should have been, but was instead walking across the railcar's platform.

On cross-examination, Pollan disagreed with Richard's counsel that the yard surveillance video showed a "surge" immediately before Richard fell. Pollan said: "I wouldn't categorize it as a surge. It is an increase in speed and that's

13

what's going to happen when you begin to move a train. It is going to increase in speed." Pollan also disagreed that the amount of slack in this train could have caused the rear railcar to surge:

"[Q]: Could [the] slack result in surge at the end of over a hundred cars?

"[A]: So, the posture of the slack at the end of the train was that it was bunched and as he starts to pull, it's going to pull that slack out and then once it pulls out then it will take off. If it was a different kind of train, . . . [t]hat could cause a whip, a massive surge on the ends, but these intermodals are made where they don't have a lot of slack, and you don't get a big slack action. [¶] . . . [¶]

"Q: If the jurors see on the video a surge, if they see with their own eyes a surge, are you telling everybody that you disagree and there is no surge on this video?

"A: What I see is an increase in speed and it is normal. So, I'm not seeing a surge."

Pollan also testified that to cause a surge in the movement of the rear railcar, there would have to be "a massive surge in that tractive effort"—that is, a huge spike in the electricity created by engaging the throttle. Pollan "didn't see that when [Pereyra] went from throttle one to throttle two. It [was] a normal increase."

Finally, Pollan disagreed with Richard's counsel that Pereyra released the brakes 24 seconds before he engaged the throttle. He explained that air travels through the train at 530 feet per second, so it would take 15 seconds for the air to reach the last railcar, and then it would take about another 5 seconds to pump up the reservoir enough to release the brake

completely.  Accordingly, although Pereyra released the train brakes 24 seconds before he engaged the throttle, there was just a few second delay from the time the train brakes were *fully* released until the throttle was engaged.

### 3.    Dr. Mark Gomez.

Dr. Mark Gomez, an injury biomechanic expert, testified that given the speed at which the rear railcar was moving, there would not have been enough force to pull Richard's hand off the grab iron had he been holding it.

### C.    Closing arguments.

In his closing argument, Richard's counsel argued that the accident happened because Pereyra mishandled the train. Counsel noted that Pereyra admitted that the proper procedure would have been to release the train brakes and apply the throttle simultaneously.  But Pereyra "didn't do . . . what he said he did"—instead, he released the brakes 24 seconds *before* he applied the throttle.  Counsel further argued that the 24-second delay "caused the surge you see on the video."

Union Pacific's counsel argued there was no evidence Pereyra acted negligently.  He urged: "Plaintiff's evidence with regard to Mr. Pereyra's negligence is—there is nothing.  No expert.  We didn't hear anybody come in and say he was improperly handling the train.  *It's Mr. Richard's speculation* that something that the engineer did in thousands of feet ahead of him [affected] what happened at the rear of the train.  That's what you heard from the plaintiff's case." (Italics added.) Counsel continued: "There are different ways to handle a train, whether you release the brakes at this time or another time.  The point is, these two gentlemen, Mr. Cramer, Mr. Pollan told you

what [Pereyra] did was proper.  In fact, it was textbook according to Mr. Cramer."

### D.    Verdict.

On March 14, 2022, by a vote of 10-2, the jury returned a special verdict finding that Union Pacific was not negligent.  The trial court entered judgment on May 12, 2022.  Richard timely appealed.

## DISCUSSION

Richard contends the trial court abused its discretion by excluding Hess's expert opinion testimony, and the error was prejudicial.  We agree.

## I.    The trial court abused its discretion by excluding Hess's expert testimony.

### A.    Legal principles.

A person is qualified to testify as an expert "if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates."  (§ 720, subd. (a).)  An expert may provide opinion testimony if such testimony is "(a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."  (§ 801.)

In *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770 (*Sargon*), the California Supreme Court clarified that under section 801, the trial court "acts as a gatekeeper to exclude speculative or irrelevant expert opinion." The court explained: " '[T]he expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors. . . . [¶] Exclusion of expert opinions that rest on guess, surmise or conjecture [citation] is an inherent corollary to the foundational predicate for admission of the expert testimony: will the testimony assist the trier of fact to evaluate the issues it must decide?" ' " (*Sargon*, at p. 770.) Accordingly, the trial court must "exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (*Id.* at pp. 771–772).

The high court warned, however, that trial courts must "be cautious in excluding expert testimony." (*Sargon, supra,* 55 Cal.4th at p. 772.) "The trial court's gatekeeping role does not involve choosing between competing expert opinions. . . . [T]he gatekeeper's focus 'must be solely on principles and methodology, not on the conclusions that they generate.' " (*Ibid.*) In other words: "The trial court's preliminary determination whether the expert opinion is founded on sound logic is not a decision on its persuasiveness. The court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion. Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture. The court does not resolve scientific controversies. Rather, it

17

conducts a 'circumscribed inquiry' to 'determine whether, as a matter of logic, the studies and other information cited by experts adequately support the conclusion that the expert's general theory or technique is valid.' [Citation.] The goal of trial court gatekeeping is simply to exclude 'clearly invalid and unreliable' expert opinion. [Citation.] In short, the gatekeeper's role 'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.' " (*Ibid.*)

We review a trial court's ruling excluding or admitting expert testimony for an abuse of discretion. (*Sargon*, *supra*, 55 Cal.4th at p. 773.) " 'The scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action. . . ." ' " (*Ibid.*) Thus, the court's discretion "is not unlimited, *especially when . . . its exercise implicates a party's ability to present its case*. Rather, it must be exercised within the confines of the applicable legal principles." (*Ibid.*, italics added.)

### B. Analysis.

As noted above, the trial court excluded Hess's expert opinion testimony because it concluded Hess "has no training or experience. He doesn't have any qualifications that the expert witnesses that are going to testify in this case have." In so concluding, the trial court erred.

For purposes of evaluating an expert's qualifications, expertise " ' "is relative to the subject," and is not subject to rigid classification according to formal education or certification.' [Citation.] Rather, an expert's qualifications can be established in any number of different ways, including 'a showing that the

expert has the requisite knowledge of, or was familiar with, or was involved in, a sufficient number of transactions involving the subject matter of the opinion.' [Citation.] In sum, with respect to expert qualification, '[t]he determinative issue in each case must be whether the witness has sufficient skill or experience in the field so that his testimony would be likely to assist the jury in the search for the truth, and no hard and fast rule can be laid down which would be applicable in every circumstance.' " (*ABM Industries Overtime Cases* (2017) 19 Cal.App.5th 277, 294 (*ABM*); see also *Malmquist v. City of Folsom* (2024) 101 Cal.App.5th 1186, 1200.) Once this threshold has been met, "questions regarding *the degree* of an expert's knowledge go more to the weight of the evidence presented than to its admissibility." (*ABM*, at p. 294.)

In the present case, it was undisputed that Hess had 42 years of experience as a railroad engineer, including many years of experience operating the same kind of train involved in this case on the same track where the accident occurred. Hess testified that he had learned through his experience what the safest way was to move a long train in that location—that is, by simultaneously releasing the train brakes and applying the throttle. Hess also testified that he had learned by experience that if he waited to apply the throttle after releasing the brakes, he would give workers on the back of the train "a rough ride."[7]

---

[7] Hess testified: "When I was trained we actually had cabooses on the rear end with two men in it or maybe more, and you had to be careful what you did. If you jostled them too much back there you would hear about it. [¶] . . . [¶] That you beat them up. It was a rough ride. You know, they wanted a smooth ride and you wanted to give them a smooth ride to keep them safe."

And, he said he knew from his experience that if a train was operated properly, the rear railcar would not accelerate as quickly as did the railcar from which Richard fell. In short, Hess's testimony at the section 402 hearing established that Hess " 'was involved in . . . a sufficient number of transactions involving the subject matter of the opinion' " (*ABM, supra,* 19 Cal.App.5th at p. 294)—that is, Hess's 42 years of experience as a train engineer qualified him to opine on Pereyra's handling of the train.

Union Pacific urges that the trial court properly excluded Hess's testimony because Hess "admitted he was not relying on the event recorder data—the most objective and important evidence describing how the train moved just before Plaintiff fell." Not so. Hess specifically testified that he reviewed the event recorder data "to see when [Pereyra] was doing throttle positions and releasing brakes . . . and the direction he was going." Moreover, Hess's opinion expressly was based on the interpretation of the event recorder data offered by Union Pacific's expert witness, Pollan. That is, Hess's opinion that Pereyra did not safely operate the train was premised on Pollan's undisputed testimony that there was a 24-second delay between the time Pereyra released the train brakes and engaged the throttle. While Union Pacific disagreed with Hess about the *significance* of this data, that disagreement is not a valid basis for excluding his opinion testimony. (See *Sargon, supra,* 55 Cal.4th at p. 772 ["The trial court's gatekeeping role does not involve choosing between competing expert opinions"].)

Union Pacific next contends that the trial court properly excluded Hess's testimony because Hess could not interpret the event recorder data showing the locomotive's increase in speed.

This data is relevant, Union Pacific urges, because "all the relevant event recorder data confirms that Mr. Pereyra had very carefully started the train's movement, gradually building up its speed without producing a surge." But the locomotive's speed was irrelevant to Hess's analysis: As we have said, Hess's opinion was that a surge at the end of the train was caused by the delay between the release of the train brakes and the engagement of the throttle, *not* the speed at which the locomotive accelerated. Because Hess's opinion did not depend on the locomotive's increase in speed, his inability to interpret that portion of the event recorder data did not undermine his opinion. It was undisputed, moreover, that the event recorder measured the acceleration of the *locomotive,* not the railcars. Union Pacific's accident investigator, Mark Cramer, testified as follows:

"Q: [I]s it correct that you can't tell from the event recorder download exactly how the railcar at the rear of the train was accelerating?

"A: That is . . . correct.

"Q: So, if you just look at the download . . . you might not see everything you need to see to know what happened here?

"A: *You are just getting the information on the movement of the locomotive, yes.*" (Italics added.)

Union Pacific also contends that the trial court properly excluded Hess's testimony because he "admitted he had no expertise and training in accident reconstruction" and "had been unable to analyze how much force would be required to have caused Plaintiff to fall, assuming he had been using a proper three-point stance as the railcar began to move." But Hess was not offered to testify about accident reconstruction or to opine that the allegedly negligent train handling caused Richard to fall.

21

His proffered testimony was much more limited—that Pereyra mishandled the train, causing a surge at the back of the train immediately before Richard fell. Manifestly, Hess's lack of expertise to testify about *some* topics does not mean he is not competent to testify about *other* topics.[8]

Next, Union Pacific contends that the trial court properly excluded Hess's testimony because Richard "hoped to improperly use Mr. Hess's statement that similar accidents never occurred while he worked as a locomotive engineer." This assertion is not followed by a record citation and has no support in the record. Even if the assertion were true, however, it would support a limitation on Hess's testimony, not his wholesale exclusion.

Finally, Union Pacific urges that Hess's testimony that the rear railcar was accelerating too fast was properly excluded because it would not have been helpful to the jury. According to Union Pacific, "the jury, having viewed the video, would be [able] to similarly assess the train's speed without the aid of expert testimony." We do not agree. Even if the jury could have independently evaluated the speed at which the rear railcar accelerated, it could not have known whether that degree of acceleration was typical when a long train began moving. This assessment was particularly significant because Union Pacific's expert, Pollan, testified that any increase shown on the video *was* "normal."

In sum, it was error for the trial court to exclude Richard's proffered expert evidence that the acceleration Richard

---

[8] Notably, Union Pacific's train handling expert, Pollan, also did not testify about the cause of Richard's fall. Union Pacific called another expert for that purpose, injury biomechanic expert Dr. Mark Gomez.

experienced at the rear of the train was out of the ordinary and was caused by mishandling of the locomotive by Union Pacific's engineer, Pereyra.

## II. The erroneous exclusion of Hess's testimony was prejudicial.

The erroneous exclusion of evidence is grounds for reversal only if "in light of the entire record, it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Brown v. County of Los Angeles* (2012) 203 Cal.App.4th 1529, 1550; see also *ABM*, *supra*, 19 Cal.App.5th at p. 293 [" 'judgment of the trial court may not be reversed on the basis of the erroneous [exclusion] of evidence, unless that error was prejudicial' "].) Having concluded that the trial court erred by excluding Hess's expert testimony, we must consider whether the error was prejudicial.

The exclusion of Hess's testimony prejudiced Richard because it is reasonably probable that a result more favorable to him would have been reached in the absence of the error. Richard's theory at trial was that he was injured because Pereyra improperly managed the train's acceleration. But Richard could not offer direct testimony about how Pereyra controlled the train because at the time of the accident he was more than 7,000 feet and 105 railcars away from Pereyra. *All* Richard could testify to was his own experience at the rear of the train—that he felt a "violent" surge that was unlike anything he had ever experienced in his career. Hess's testimony would have allowed him, as the party with the burden of proof, to connect the surge he said he experienced to the allegedly negligent actions of a Union Pacific employee.

23

The exclusion of Hess's testimony was especially damaging to Richard because two witnesses for Union Pacific, Cramer and Pollan, were permitted to testify to their opinions that Pereyra's actions were safe and appropriate. Both experts discussed Pereyra's actions in detail and offered the conclusions that "[i]t was a textbook start," "[t]here is no train handling issue," and Pereyra was "extremely careful." Because the trial court had excluded Hess's testimony, Richard was not able to rebut these opinions with a contrary expert opinion.

Finally, Hess's exclusion prejudiced Richard's case because Union Pacific highlighted the absence of a plaintiff's expert in its closing argument, telling the jury: "Plaintiff's evidence with regard to Mr. Pereyra's negligence is – there is nothing. *No expert*. We didn't hear anybody come in and say he was improperly handling the train. It's Mr. Richard's speculation that something that the engineer did in thousands of feet ahead of him [affected] what happened at the rear of the train. That's what you heard from the plaintiff's case." (Italics added.) In short, Union Pacific's counsel expressly argued to the jury that Richard had not met his burden of proof because no expert testified on his behalf that Union Pacific's engineer negligently handled the train.

For all of these reasons, the trial court's exclusion of Hess's testimony prejudiced Richard because it left him without an expert witness to offer evidence of Pereyra's alleged negligence. Accordingly, the judgment must be reversed.

## DISPOSITION

The judgment is reversed and the matter is remanded for a new trial.  Richard is awarded his appellate costs.


BERSHON, J.*


We concur:


EDMON, P. J.


EGERTON, J.


---

*       Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| TERRENCE RICHARD, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> UNION PACIFIC RAILROAD COMPANY, <br><br> Defendant and Respondent. | B322044 <br><br> Los Angeles County <br> Super. Ct. No. BC665842 <br><br> **Order Certifying Opinion for Publication** <br><br> [No change in judgment] |

THE COURT:

The opinion in the above-entitled matter filed on September 30, 2024, was not certified for publication in the Official Reports. Upon request by appellant and for good cause, it now appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The opinion is ordered published in the Official Reports.



EDMON, P. J.          EGERTON, J.          BERSHON, J.*

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.